Squire, Sanders & Dempsey, Cleveland, for plaintiff in error.

Frank F. Gentsch, Cleveland, and Taylor C. Burneson, for defendant in error.

For full opinion see 6 OO 244; 52 Oh Ap 120.

**KAPLAN v WILSON** (2 cases)

Ohio Appeals, 8th Dist, Cuyahoga Co

Nos 15096 & 15097.  Decided April 13, 1936

## OPINION

By MIDDLETON, PJ.

We see no necessity of going into great detail in respect to what occurred prior to the accident. The controlling question in this review is the relation between Rudolph Lengle and the defendant Kaplan at the time of the accident. It is contended by the Wilsons that Lengle was operating as an agent or employee of Kaplan, and it is urged by Kaplan that Lengle was an independent contractor and that he (Kaplan) was in no way connected with or responsible for any act of Lengle or any negligence on his part while transporting the steel to Cleveland.

At the time of the accident Kaplan was licensed by the Public Utilities Commission as a common carrier, and his certificate was number 3476 P.U.C.O. He was located in Cleveland and controlled in the operation of his business a number of trucks, some of which were certified and others were not. At the time of the accident he had a contract with Steel and Tube, Inc., located in Cleveland, to haul steel for that company from the plant of the Republic Steel Company located at Warren, Ohio. He was paid for this service at the rate of $1.75 per ton. Rudolph Lengle was also engaged in hauling on the highways but he was what is known as a private motor carrier and he was limited by his license to transporting material of the Forest City Foundry Company in Cleveland to parties in Warren, Ohio. The number of his license was 45. When the accident occurred Lengle was not authorized to haul any material or any steel from Warren to Cleveland, nor could he haul any of the products of the Republic Steel Company to Cleveland or anywhere else or the products of any company other than those of the Forest City Foundry Company.

Referring now to the evidence which reflects on the relations between Lengle and Kaplan at the time of the accident, it appears from the record that some time in June, 1933, Lengle had some hauling from his company to Warren and he desired to have some return work from Warren and not be compelled to return empty. He then went to Kaplan and asked him if he could get from Kaplan some return loads from Warren to Cleveand. He testifies as follows (Record, page 379): "Kaplan said 'Yes, I can give you some return loads'."

Then the witness testified further:

"Q. What business did Mr. Kaplan give you?

A. He gave me some steel from Republic Steel to Cleveland.

Q. What is the name of the consignee?

A. You mean the steel?

Q. No. Where were you to haul it to in Cleveland?

A. Well, mostly it was Steel and Tubes, Cleveland."

The witness testifying further said:

"I asked him what he paid per ton and he said $1.65, and off of that he would have to take off $1.20 for the Public Utilities Commission."

The witness testified that this $1.20 a day was for the use of the unit and that amount he paid to the Utilities Commission for the hauling.

Now this in short was the contract between Kaplan and Lengle under which Lengle was operating his International tractor and trailer at the time of the accident. It is admitted in the pleadings and not in dispute that in order to enable Lengle to meet the requirements of the law Kaplan permitted him to use a license plate of Kaplan's on his tractor in making the return trip to Cleveland, and on the evening of the accident Lengle's International tractor bore a license plate of Kaplan's No. 3476. Notwithstanding these circumstances, regarding which there is no dispute, it is urged that under the authority of the case of Leonard v Kreider, 128 Oh St 267, what has here been referred to in respect to the use of Kaplan's license plate is of no consequence or legal effect. In this connection, however, it must be noted that Kaplan in his testimony to the jury freely admitted furnishing a license plate to Lengle, and on the day in question he ordered Lengle's outfit to stop in Warren on its return and admitted that it was being returned under one of his license plates. Interrogated on this subject he was asked:

"Q. He couldn't have hauled back unless he hauled under your certificate number?

A. That's right.

Q. You told him to stop there in Warren and bring a load back under your certificate number for you?

A. Yes sir."

In view of Kaplan's testimony we are not at all persuaded that the case cited may

not apply to the one under consideration. We are not convinced by that authority that the furnishing of a license plate was not a fact to be considered by the jury in determining under the common law what the relations actually were between Kaplan and Lengle. When Kaplan gave Lengle one of his license plates for the purpose of having it placed on the machine Lengle was to use in transporting the shipment in question to Cleveland he knew that that plate was a notice to the public that he was connected with the truck in question in some capacity. Kaplan was under contract to transport the load to Cleveland. It was his obligation to complete the contract. He could not relieve himself of that responsibility by employing a so-called independent carrier and giving him one of his license plates to enable the contractor to complete the work. Kaplan was legally in control of the material of shipment from the time it left Warren and reached Cleveland. The mere fact that he had nothing to do with the actual operation of the machine on the highway is not sufficient in any way to change that situation. Lengle had no control whatever over the material he was transporting to Cleveland. Kaplan collected the transportation charges from the consignee and out of that commission he paid Lengle at the rate of $1.65 per ton and deducted therefrom $1.20 due the Utilities Commission which Kaplan paid and which he was required to pay under Rule 12 of the Commission.

It is our conclusion from all the evidence that when Kaplan furnished the license plate to Lengle he thereby made him his agent or employee to make the transportation to Cleveland. But what has been repeated here is not by any means the only evidence tending to show that Kaplan recognized Lengle as his agent or employee. On March 30 the record shows that Kaplan addressed a letter to one M. C. Knisley, who was connected with the Public Utilities Commission, in which he stated:

"This will acknowledge receipt of your communication of the 28th in relation to report made by Mr. Ryan in regard to accident of Mr. Rudolph Lengle. I believe the best way to straighten this out is to give you the entire facts as they appear to me. On or about March 5th or 6th Mr. Ryan, your inspector, called me and said that one of my men, Mr. Lengle, had been in an accident near Moreland Hills Village, Ohio, and he wanted to know what I was going to do about it."

Then Kaplan proceeds to explain what had occurred on the evening of the accident. Why was any explanation necessary on the part of Kaplan if Lengle was an independent contractor? Why was it necessary for Kaplan to say anything more than to inform Mr. Knisley that Lengle was an independent contractor and that he personally knew nothing of the details of the accident? Kaplan knew at the time he wrote this letter that Ryan, the inspector, had seen his (Kaplan's) plate on the International tractor involved in the accident. At least the trial court had a right to reach this conclusion. Moreover, Lengle makes no claim in his testimony of acting wholly independent of and as having no relations whatever with Kaplan. There is evidence in the record to the effect that Kaplan signed the shipping order. This is in dispute. The order itself is sufficient to justify the conclusion that his name was placed thereon by him or with his authority.

It is further contended by Kaplan that Adah R. Wilson, who was driving the automobile, was guilty of contributory negligence. The evidence in support of this contention is not without some force. However, it is in conflict with her testimony and that of her husband, and it was the sole responsibility of the trial court to find what in its judgment was the truth in respect to the situation and what occurred. The conclusions of the trial court are protected by the same rules as apply to the verdict of a jury.

It is our conclusion that there is no legal reason for interfering with the judgments and they are affirmed.

Judgment affirmed.

BLOSSER and McCURDY, JJ, concur.